## BOARD OF COUNTY SUPERVISORS OF PRINCE WILLIAM COUNTY

### V.

## SIE-GRAY DEVELOPERS, INC., ET AL.

Record No. 821358

September 6, 1985

Present: All the Justices

*Elizabeth D. Whiting, Deputy County Attorney (John H. Foote, County Attorney,* on briefs), for appellant.

*Michael L. Zimmerman (Gerald F. Dalton; Brault, Geschickter, Palmer & Grove; Scaife and Dalton,* on brief), for appellees.

COCHRAN, J., delivered the opinion of the Court.

This contract action was based upon the failure of Sie-Gray Developers, Inc., to complete the development of a proposed subdivision known as Daleview Manor. Sie-Gray and the Board of Supervisors of Prince William County (the County) executed four separate performance agreements, the first three of which covered the public improvements to be completed under the approved plans for sections 1, 2A, and 2B, respectively, and the fourth of which covered performance under the approved plans for sections 2C and 2D. Each agreement was accompanied by a performance bond executed by Sie-Gray as principal, Stephen J. Siegel and William C. Gray as co-principals, and Republic Insurance Company as surety.[1]

The county filed its motion for judgment against Sie-Gray, Siegel, Gray, and Republic, seeking to recover damages for breach of the performance agreements and bonds.[2] Siegel never appeared and was found in default. At trial, the court sustained the remaining defendants' motions to strike the County's evidence in two respects. First, the court, relying on *Hylton v. Prince Wil-*

---

[1] Republic's bonds guaranteeing performance were in the amounts of $312,100, $17,300, $18,750, and $66,567, respectively.

[2] The County sought to obtain judgment jointly and severally against Sie-Gray, Gray, and Siegel in the amounts of $312,300, $18,300, $45,800, and $66,567, a total of $442,967, and against Republic in the amounts of $312,100, $17,300, $18,750, and $66,567, a total of $414,717, the aggregate face amounts of the bonds, with interest, costs, and attorney's fees.

*liam Co.*, 220 Va. 435, 258 S.E.2d 577 (1979), ruled that the County had not authority to require the subdivider to construct certain improvements to State Route 640 (Minnieville Road), that Sie-Gray had agreed to make these improvements under protest,[3] and that damages resulting from failure to make these improvements were not recoverable. Second, the court ruled that, because the County failed to present evidence of actual damages for failure to begin and complete improvements in sections 2C and 2D, there could be no recovery under the fourth agreement and bond.

The court found, in accordance with a stipulation of the parties, that the date of breach was November 15, 1979. Accordingly, the court submitted to the jury the issue of damages under the first three performance bonds. The jury returned a verdict for the County fixing damages for section 1 at $105,455, for section 2A at $13,820, and for section 2B at $17,560, with interest from April 1, 1980. The court entered judgment on this verdict against all the defendants in the total amount of $136,835. The court also entered judgment in this amount for Republic against Siegel and Gray.

Michael T. Hall and others (collectively, Hall) contracted to purchase the property in 1975 and platted the subdivision known as Daleview Manor. Hall received preliminary approval of the subdivision but was unable to obtain final approval because he refused to agree to make certain improvements to Route 640, an existing state-maintained road that abutted the proposed subdivision. Hall sold his interest under the contract to purchase to Sie-Gray, which received final approval after submitting a plan under which it agreed to upgrade the adjoining two-lane road to four lanes. Hall testified that Sie-Gray's position was "We'll go ahead and build the road and get the plan approved at this time."

Sie-Gray made an agreement with Hall, not disclosed to the County, to pay Hall an additional $25,000 if it prevailed in its contention that the County was without authority to require the highway improvements. Sie-Gray made no statement to the County that it agreed to the improvements under protest; nor did Sie-Gray file suit to challenge the County's authority to require such improvements or make its agreement conditioned upon the outcome of *Hylton*, then in litigation in the trial court.

---

[3] These highway improvements were contemplated under the performance agreement covering section 1, and their cost was considered in computation of the performance bond in the amount of $312,100.

Sie-Gray's performance under the subdivision plan and contracts was satisfactory until the fall of 1979. In November of 1979, Sie-Gray began having such financial difficulties that it was unable to maintain the construction pace or keep a supervisor at the site. Two independent construction companies building homes in the subdivision allowed their crews and equipment to damage much of Sie-Gray's work on public improvements such as sidewalks, curbs, and gutters.

On November 14, 1979, Hall foreclosed under a second deed of trust on sections 2C and 2D and some adjoining unsubdivided acreage which secured an obligation held by him. Hall purchased this property at the foreclosure sale and agreed to complete the streets and other subdivision improvements Sie-Gray was obligated to construct.

Gray met with various County personnel at the construction site on November 15, 1979, and the parties stipulated this date as the "[l]ast date all parties agree that Sie-Gray performed any work at Daleview Manor." The County, however, offered evidence that between November 15 and November 27 Sie-Gray performed additional work on a cul-de-sac, storm sewers, and streets. In February 1980, after *Hylton* had been decided, Sie-Gray obtained an entrance permit from the Virginia Department of Highways and Transportation to construct the frontage improvements on Route 640. Sie-Gray never notified the County of its inability to complete the improvements under the contracts.

On April 1, 1980, the County notified Sie-Gray, Gray, and Republic that Sie-Gray was in default in its contract obligations. None of them responded to this notice. The County proceeded over the following months to prepare lists of the work yet to be performed under the contracts, to receive bids for completion of the construction, and to accept the bid of Faught Construction Company to complete the improvements in sections 1, 2A, and 2B. The County ultimately paid $384,388 for completion of this work. In addition to the expense incurred in completing these three sections, the County sought to recover $66,567 committed to Hall for completion of sections 2C and 2D and certain frontage and turn-around easements over sections 2C and 2D needed to complete the improvements to Route 640 and to construct certain streets required by the plans for section 1.

The County contends the trial court misapplied *Hylton* to hold that the County exceeded its authority in contracting with

Sie-Gray for the improvement of Route 640 adjacent to the subdivision. We agree.

*Hylton* addressed the issue whether a local governing body had the power to require a subdivision developer to construct improvements to existing public roads. Finding no authority, express or implied, in the enabling statutes and local subdivision ordinances or the statutes governing the state highway system, we held that the County had refused to approve an otherwise acceptable subdivision plan on an invalid ground. 220 Va. 440-42, 258 S.E.2d at 580-81. *Hylton*, however, left unresolved the question whether a subdivider may voluntarily agree to make improvements to existing access roads. *Id.* at 439, 258 S.E.2d at 580.

Unlike the developer in *Hylton*, Sie-Gray agreed to construct the improvements to Route 640 which the County sought, dedicating lands for the highway expansion and submitting plans for construction of two additional lanes of travel. Unlike the developer in *Hylton*, Sie-Gray made no attempt to challenge the County's authority to impose a requirement that it improve the highway.

■ Although Sie-Gray apparently questioned the County's authority to require such improvements, it contemplated that the plan, including the improvements, would be approved and developed. Accordingly, it negotiated with Hall a contract price that was $25,000 less than the price it would pay if the highway construction requirement were waived. This transaction demonstrates that Sie-Gray voluntarily embarked on this development, negotiating a means to cover additional costs incurred by the highway construction and assuming the risk that it could bear the financial burden imposed by its agreement to make such improvements.

■ The trial court ruled and the appellees contend that Sie-Gray's agreement was made under protest. This ruling, however, finds no support in the evidence. Although Hall refused to incorporate the improvements in the subdivision proposals he submitted, no such refusal was ever voiced by Sie-Gray. The only evidence of Sie-Gray's unwillingness to make the improvements was Hall's testimony about their contract negotiations. Any reluctance or unwillingness of Sie-Gray, while perhaps known to Hall, was never communicated to the County. Sie-Gray's agreement was not expressly or implicitly made under protest. The trial court inferred an agreement made under duress, but the record does not support the inference.

■ The appellees also contend that the County was unable to enter this contract requiring the developer to construct highway improvements because of Dillon's Rule and its corollary applicable to county boards of supervisors. *See Hylton*, 220 Va. at 440, 258 S.E.2d at 581; *Board of Supervisors* v. *Horne*, 216 Va. 113, 117, 215 S.E.2d 453, 455 (1975). Because under *Hylton* it was not within the County's power to require these improvements as a condition for subdivision approval, appellees urge that the agreement, even if voluntarily executed by Sie-Gray, was ultra vires and therefore void and unenforceable. We do not reach the merits of this argument, however. To allow appellees to assert a defense of ultra vires would contravene the general principle that "one who makes a contract with a municipality is estopped to assert that it was ultra vires, when it is sought to be enforced against him." 10 E. McQuillin, The Law of Municipal Corporations § 29.133 (3d ed. rev. 1981); *see City of Warwick* v. *Boeng Corp.*, 472 A.2d 1214, 1218 (R.I. 1984 1984); *cf. Deal* v. *Commonwealth*, 224 Va. 618, 622-23, 299 S.E.2d 346, 348-49 (1983). A defense unavailable to Sie-Gray would likewise be unavailable to Republic, as surety. *See Bd. of Sup.* v. *Safeco*, 226 Va. 329, 337, 310 S.E.2d 445, 450 (1983). Additionally, appellees cannot avail themselves of a defense raised for the first time on appeal. *See* Rule 5:21, now Rule 5:25; *Fairfax County* v. *M.&S., Inc.*, 222 Va. 230, 238, 279 S.E.2d 158, 162 (1981) (issues not presented by pleadings or in trial below not properly before this Court for adjudication).

The County next argues that the trial Court erroneously struck its evidence of damages resulting from breach of the fourth performance agreement covering sections 2C and 2D. We disagree.

■ A performance bond guarantees completion of the improvements it covers. *Safeco*, 226 Va. at 335, 310 S.E.2d at 448-49; *Supervisors* v. *Ecology One*, 219 Va. 29, 36, 245 S.E.2d 425, 430 (1980). The County could properly contract with another developer for the performance required of Sie-Gray and assign to that developer its rights under the performance bond. *Ecology One*, 219 Va. at 34, 245 S.E.2d at 428. Any damage recovery is limited, however, to the reasonable costs of completion, not to exceed the face amount of the bond. *Id.* at 35, 245 S.E.2d at 429.

■ Where the County proves that the costs of completion exceed the face amount of the bond, it may recover the full bond amount although the work has not yet been performed in view of

the presumption that public officials will lawfully perform their duties. *Safeco*, 226 Va. at 338, 310 S.E.2d at 450. But if the evidence shows that the County has assigned its rights under the original performance bond for a purpose other than completion of the contemplated construction, this presumption is rebutted. Recovery on the bond should not be permitted for damages that are not the result of breach of the bonded agreement.

The County's evidence showed that it executed an agreement with Hall for construction of improvements which Sie-Gray had contracted to make in sections 2C and 2D. Hall agreed to execute a performance agreement and provide a bond with appropriate surety covering installation of the public improvements for which Sie-Gray was obligated. Hall also agreed to convey certain easements required to complete the highway construction and other public improvements in section 1. The County agreed to pay Hall the face amount of Sie-Gray's performance bond on sections 2C and 2D upon his completion of 70% of the required improvements in sections 2C and 2D.

Hall testified that he entered the contract because he knew the County was considering vacating the subdivision plat as to the lots in sections 2C and 2D; the easements were conveyed as requested by the County in return for the face amount of the bond and the County's promise to keep sections 2C and 2D intact as lots on a recorded plat. The parties did not arrive at the bond amount as a price which reflected the value of the easements, and Hall did not know their value. The County presented no evidence of the value of the easements conveyed.

Hall testified that, as of the time of trial, no work had been done to install the improvements or construct houses in sections 2C and 2D. The record does not reveal whether Hall executed the performance agreement and bond required by his contract with the County. As of the time of trial, Hall had sold the property to another developer and no longer had any interest in the property.

 The contract between Hall and the County bound Hall to develop the subdivision, but the County presented no evidence of the consideration given for this obligation. Although the County could properly assign its rights under the bond to Hall for Hall's commitment to install the improvements guaranteed by the bond, it also agreed to pay the face amount of the bond as consideration for easements needed on Hall's property. As the County conceded on brief, the need for these easements arose from breach

of Sie-Gray's obligation to develop section 1. The cost of acquiring these easements is an element of the damages flowing from Sie-Gray's breach of the agreement covering section 1; the bond covering section 2C and 2D, which guaranteed performance only in those sections, would not be implicated in an action for the cost of the easements.

Having failed to demonstrate the portion of the consideration which the contracting parties attributed to the cost of completion of sections 2C and 2D and the amount paid as consideration for the easements, the County failed to show that the full bond amount, or any specific portion thereof, was committed to Hall for a proper purpose. Since the evidence rebutted the presumption that the bond amount would be used to complete the contemplated development of sections 2C and 2D, the County could not recover on the bond absent evidence of the amount of damages allocable to this purpose.

The trial court sustained the defendant's motions to strike the evidence and dismissed the County's claim for damages to sections 2C and 2D on a different theory. It ruled that an agreement to pay the amount of the bond to Hall for performance of Sie-Gray's obligations was not evidence of actual damages. The court also ruled that the value of the easements could have been recovered on this bond but that the County failed to prove their value. We agree only with the result: the evidence was properly struck because the County failed to show the amount it would pay for the construction guaranteed by the bond.

The County's final contention is that the trial court erred in fixing the date of breach as a matter of law. The court ruled that the breach occurred November 15, 1979, the last day Sie-Gray performed work at Daleview Manor. The court based its ruling on the stipulation of the parties, which could be so construed, and we will not disturb this ruling.

We will affirm the judgment of the trial court except as to the agreement and performance bond covering section 1. For the error in excluding evidence of the cost of making the highway improvements required by that agreement and performance bond, we will reverse the judgment and remand the case for a new trial limited

to the issue of damages in respect to section 1, consistent with the views herein expressed.

*Affirmed in part;*
*reversed in part;*
*and remanded.*

RUSSELL, J., dissenting.

The majority concludes that Sie-Gray voluntarily acceded to Prince William County's illegal demands and, therefore, forfeited its right to any relief under *Hylton* v. *Prince William Co.*, 220 Va. 435, 258 S.E.2d 577 (1979). That conclusion is not supported by the evidence.

We held in *Hylton* that the County had no authority to require a developer to make off-site improvements on existing public roads in order to obtain the County's approval of an otherwise acceptable subdivision plan. Yet, when Hall, the original developer here, submitted a proper plan, the County refused to approve it for precisely that reason. Hall sold to Sie-Gray, which agreed to improve the existing road because, and only because, it could obtain the County's approval in no other way. Both Hall and Sie-Gray were faced with a simple choice: either "agree" to make the road improvements or forget the proposed development. To characterize an agreement made under these circumstances as "voluntary" is to engage, at best, in circular reasoning.

I think the trial court correctly determined that the "agreement" was coerced and properly refused to enforce it. I would not permit the County to profit by its wrong and would affirm the judgment.

COMPTON, J., joins in dissent.